JDN

WO

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

Calvin Clinton Ward,
Plaintiff,
v.
Thomas Arbaugh, et al.,
Defendants.

No. CV-24-02468-PHX-JAT (JZB)

**ORDER**

Plaintiff Calvin Clinton Ward, who is currently confined in the Arizona State Prison Complex (ASPC)-Eyman Complex, South Unit, brought this pro se civil rights action under 42 U.S.C. § 1983 against multiple Arizona Department of Corrections, Rehabilitation, and Reentry (ADCRR) officials. (Doc. 1.) Before the Court is Defendants' Motion for Summary Judgment, which Plaintiff opposes. (Docs. 57, 70.)[1] The Court will grant the Motion in part, deny it in part, and set a new dispositive motions deadline.

## I. Background

Plaintiff named as Defendants Deputy Assistant Director Rod McKone, Assistant Deputy Warden Raymond O'Brien, Senior Chaplain William Thomas, and Chaplain Dale Gulley. (Doc. 1.) The Court joined Director Ryan Thornell as a Defendant in his official capacity as to Plaintiff's claims for injunctive relief. (Doc. 6 at 15–16, 18, 21.)

---

[1] Upon the filing of State Defendants' Motion for Summary Judgment, the Court issued an Order with the Notice required under *Rand v. Rowland*, 154 F.3d 952, 960 (9th Cir. 1998) (en banc), which informed Plaintiff of the requirements under Federal Rule of Civil Procedure 56 and set a briefing schedule. (Doc. 59.)

Plaintiff is a devout adherent of Odinism. (Doc. 1 at 3.) Plaintiff alleged that Defendants violated his rights with respect to requests for religious accommodations. (*Id.*) On screening, the Court found that Plaintiff sufficiently stated (1) claims under the First Amendment and Religious Land Use and Institutionalized Persons Act (RLUIPA) against Thornell in his official capacity and against Thomas, O'Brien, and McKone in their individual capacities with respect to Plaintiff's request for sacred land for group ceremonies (Count One); (2) claims under the First Amendment and RLUIPA with respect to Plaintiff's request to fast and exercise a vow of silence against Thornell in his official capacity and against Gulley, O'Brien, Thomas, and McKone in their individual capacities (Count Two); and (3) an Equal Protection claim with respect to Plaintiff's request for sacred land against Thornell in his official capacity and against Gulley, Thomas, O'Brien, and McKone in their individual capacities (Count Two). (Doc. 6.)

Defendants move for summary judgment on the grounds that denial of designated sacred outdoor space does not impose a substantial burden on Plaintiff's religious exercise, Defendants have a compelling governmental interest in their practice of denying designated sacred outdoor space, denial of a nine-day fast did not impose a substantial burden on Plaintiff's religious exercise, Defendants have a compelling governmental interest in their fasting approval protocol, and Defendants did not violate the Equal Protection Clause in denying Plaintiff's request for sacred land. (Doc. 37.)[2]

## II. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The

---

[2] Defendants also argue that Defendant Thornell is entitled to qualified immunity. (Doc. 57 at 14–15.) Thornell was joined as a Defendant in his official capacity only. (Doc. 6 at 21.) Qualified immunity is a defense only to claims against a defendant in his or her individual capacity. *Cmty. House v. City of Boise, Idaho*, 623 F.3d 945, 966 (9th Cir. 2010); *see Hallstrom v. City of Garden City*, 991 F.2d 1473, 1482 (9th Cir. 1993) (employees sued in their official capacities may not assert the defense of qualified immunity). Thus, the Court will not consider Defendants' qualified immunity argument.

movant bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, if any, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323.

If the movant fails to carry its initial burden of production, the nonmovant need not produce anything. *Nissan Fire*, 210 F.3d at 1102–03. But if the movant meets its initial responsibility, the burden then shifts to the nonmovant to demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 250 (1986); *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). The nonmovant need not establish a material issue of fact conclusively in its favor, *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968); however, it must "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal citation omitted); *see* Fed. R. Civ. P. 56(c)(1).

At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249. In its analysis, the court does not make credibility determinations; it must believe the nonmovant's evidence and draw all inferences in the nonmovant's favor. *Id.* at 255; *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). The court need consider only the cited materials, but it may consider any other materials in the record. Fed. R. Civ. P. 56(c)(3). Further, where the nonmovant is pro se, the court must consider as evidence in opposition to summary judgment all of the pro se litigant's contentions that are based on personal knowledge and that are set forth in verified pleadings and motions. *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004); *see Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995).

## III. Relevant Facts

Plaintiff's claims arose during his confinement in the Lewis Complex, Barchey

Unit. (Doc. 71 ¶ 4a.) Plaintiff became an adherent of Odinism, sometimes called Asatru, Wotanism, or Heathenism, in approximately 1999. (Doc. 1 at 8.) He is an official member of the Asatru Religious Community and a recognized member of the Might of Mjolinir Kindred. (*Id.*) Plaintiff's official religious preference in ADCRR records is Odinism. (Doc. 58 ¶ 5.)

**A. Sacred Land**

Requests for faith-based accommodations must be made in writing to a unit Chaplain/Senior Chaplain. (Doc. 58 ¶ 10; Doc. 71 ¶ 10.) Under the ADCRR policy governing faith-based activities, regular worship/study opportunities must be provided based on prisoner requests, space availability, time considerations, institutions' safety and security requirements, and availability of qualified faith community leadership. (Doc. 58 ¶ 11; Doc. 71 ¶ 11.) Odinist prisoners can participate in multifaith group services at the prison Unit, which occur once weekly. (Doc. 58 ¶ 14; Doc. 71 ¶ 14.) Plaintiff has been permitted to attend multifaith group services whenever he submitted such requests. (Doc. 58 ¶ 16; Doc. 71 ¶ 16.)

Outdoor gatherings for worship are only available upon request specifying when, where, and who will participate and with prior approval. (Doc. 58 ¶ 17; Doc. 71 ¶ 17.) No faith-based groups have access to "sacred land" at ADCRR prisons; however, ADCRR has Sweat Lodges, which are constructed in an area 30 by 40 feet, on the grounds of all institutions where there are sufficient number of eligible Native American prisoners and they have made requests for a Sweat Lodge. (Doc. 58 ¶¶ 19–21.) Similar to other outdoor worship activities, Native American prisoners must obtain prior approval before participating in a Sweat Lodge ceremony. (*Id.* ¶ 23; Doc. 71 ¶ 23.)

Defendants assert that there are currently approximately 1,714 prisoners at ADCRR who have selected Native American as their religious preference. (Doc. 58 ¶ 7.)[3] On

---

[3] Plaintiff disputes the number of prisoners registered with Native American religious preference, and he objects to the admissibility of this evidence. (Doc. 71 ¶ 7.) Defendants' asserted fact as to the number of prisoners with certain religious preferences is supported by the declaration of Faith Services Administrator N. Wood, who avers that

November 29, 2025, Plaintiff and another prisoner personally observed the Native American prisoners perform a Sweat Lodge Ceremony at the Sweat Lodge at South Unit. (Doc. 71 ¶ 21d.) There were only 6 Native Americans who participated in the ceremony. (*Id.*; Doc. 72 at 131, William Gunseth Decl. ¶ 2.)

Defendants assert that there are currently approximately 77 prisoners at ADCRR who have selected Odinism as their religious preference, including 3 who are housed at the South Unit, where Plaintiff is now housed. (*Id.* ¶ 6.) Plaintiff disputes these numbers and asserts that at the South Unit, there are currently approximately 15 prisoners who meet every Friday evening for group studies. (Doc. 71 6a.) Plaintiff submits a copy of the "Asatru Service Sign-In Sheet" for services on December 19, 2025; this form lists 14 prisoners who identify as Asatru or Odinism, and one prisoner who identifies as Wotanism. (Doc. 72 at 123.)

On March 12, 2024, Plaintiff submitted an Informal Complaint requesting a designation of "sacred land," similar to the area provided to Native Americans, that may be used solely for Odinist ceremonial purposes. (Doc. 72 at 110, 112.) Plaintiff attached documentation to the Informal Complaint showing that sacred land is essential to performing Odinist ceremonies. (*Id.* at 112.) Plaintiff's request was denied, and he was informed:

> [T]he designation of sacred land within the correctional facility is not a practice that aligns with the tenets of Odinism or the policies outlined in Department Order 904. This order provides guidelines for accommodating

---

her declaration is based on her personal knowledge, experience, and a review of relevant records maintained by ADCRR. (Doc. 58 at 7-8, Wood Decl. ¶¶ 1, 2.) Defendants do not attach to Wood's declaration records showing the number of prisoners registered with Native American religious preference or any other religious preference. (*See id.*) Defendants' asserted fact is not properly supported. *See* Fed. R. Civ. P. 56, advisory comm. note to 2010 amendments ("[m]aterials that are not yet in the record—including materials referred to in an affidavit or declaration—must be placed in the record"); *Sapiano v. Millenium Entm't, LLC*, CV 12-8122 PSG (MAN), 2013 WL 12120262, at *4 (C.D. Cal. Nov. 14, 2013) ("when a party refers to documentary evidence as the source of a factual allegation in an affidavit or declaration, the party must attach the relevant documents to the affidavit or declaration"). Nonetheless, as discussed below, Defendants' arguments that rely on Wood's averments as to the number of Native American practitioners are insufficient to support summary judgment. Plaintiff is therefore not prejudiced by the Court's consideration of this evidence. Plaintiff's objection will be overruled.

> various religious activities, including access to religious materials, diets, and other aspects of faith, but it does not include provisions for designating sacred land within the institution. The Odinist faith, which is rooted in ancient Norse and Germanic religious practices, places emphasis on the veneration of Norse gods and goddesses, the observance of seasonal festivals, and the practice of personal spirituality. However, the designation of specific sacred sites within a correctional setting is not a fundamental requirement for practicing this faith.

(*Id.* at 110.)

Plaintiff then filed a Formal Grievance reiterating his request for sacred land and noting that he had provided documentation to support his request, but it apparently was ignored. (*Id.* at 112–113.) On April 11, 2024, Plaintiff received the Formal Grievance Response, which was verbatim of the Informal Complaint Response. (*Id.* at 114.)

On April 12, 2024, Plaintiff submitted a Grievance Appeal regarding his request, and he wrote that Department Order (DO) 904 provides for designated sacred land for the Native American Faith Community and almost every unit within the ADCRR has sacred land for Native Americans. (*Id.* at 116.) Plaintiff expressed his sincere belief that sacred land is required to perform his Odinist/Asatru rituals in a group setting, and he noted that he submitted documentation supporting this belief but that documentation is still being ignored. (*Id.*) Plaintiff wrote that denying his request on the basis that it is not a fundamental requirement of his faith is unlawful under the First Amendment and RLUIPA. (*Id.*) Plaintiff alleged that denying his faith group sacred land constituted a substantial burden on their religious exercise, and he noted that they have tried alternative ways to perform their rituals in a group setting but the alternatives did not work due to constant interruptions and forced practice with other faith groups. (*Id.* at 117.) On May 13, 2024, Plaintiff received a Grievance Appeal Response, which was verbatim of the prior Responses. (*Id.* at 118.)

On May 14, 2024, Plaintiff submitted a Second-Level Grievance Appeal complaining that his issue was not resolved, there had been no full and fair investigation, all of his supporting documentation had been ignored, and he received cut-and-paste responses to his prior complaints. (*Id.* at 120.) Plaintiff then repeated the arguments for

his request for sacred land. (*Id.* at 120–121.) The Response, issued on June 13, 2024, denied Plaintiff's request and informed him that, pursuant to DO 904, prison officials must designate in each unit at least one appropriate area for religious activities, but these areas do not need to be solely used for religious activities. (*Id.* at 122.) The Response further stated, "ADCRR is committed to facilitating religious activities and accommodations consistent with the safe, secure, and orderly operation of the institution and has a compelling interest to not designate specific plots of land for various religious." (*Id.*)

**B. Fasting and Vow of Silence**

The ADCRR policy governing religion provides that food abstinence may be requested in accordance with the provisions for fasting outlined in the Food Service System Technical Manual. (Doc. 58 ¶ 25; Doc. 71 ¶ 25.) Defendants assert that ADCRR does not prohibit religious fasting or vows of silence; rather, it requires prisoners to follow a reasonable approval process to ensure health and safety. (Doc. 58 ¶ 29.)

On January 11, 2024, Plaintiff submitted an inmate letter requesting a religious accommodation to abstain from food and speaking for 9 days. (Doc. 71 ¶ 29f.) Plaintiff outlined the reasons for his request in detail. (*Id.*)

On January 25, 2024, Defendant Gulley responded to Plaintiff's request by asking him to "provide authoritative text that mandates your request to abstain from food." (*Id.* ¶ 29g; Doc. 72 at 33.)

On January 28, 2024, Plaintiff wrote to ADCRR Chaplaincy and asked them to please advise where in ADCRR DO 904 it requires a prisoner to produce documentation of a religious requirement in order to receive a religious accommodation. (Doc. 72 at 34.) Plaintiff complained that his request for a religious accommodation to abstain from food was being denied for this reason. (*Id.*)

On January 30, 2024, Plaintiff submitted an Inmate Informal Complaint Resolution in which he explained his inmate letter request and Defendant Gulley's response thereto. (*Id.* at 35.) Plaintiff wrote that there is no "authoritative text" in his religion that demonstrates his request is "mandated" because Odinism does not require religious

compulsion or obedience to religious mandates. (*Id.*) Plaintiff explained that it was his personal belief that fasting and abstaining from talking for 9 days, 4 times a year, will assist in his personal regimen of spiritual discipline and show his dedication and commitment to Allfather Odin. (*Id.*) Plaintiff also noted that, under DO 904, § 4.0, abstinence is permitted and there is no requirement for a prisoner to provide "authoritative test" demonstrating that a requested accommodation is "mandated" to obtain approval. (*Id.*)

Plaintiff did not receive a response to his Informal Complaint. (*Id.* at 38; Doc. 72 at 6, Pl. Decl. ¶ 16.)

On February 14, 2024, Defendant Thomas responded to Plaintiff's January 28, 2024 inquiry about where in DO 904 it requires a prisoner to produce documentation to show a requirement for a religious accommodation. (Doc. 72 at 34.) Defendant Thomas informed Plaintiff that all religious accommodations must be supported by a religious text supporting the requested accommodation. (*Id.* at 34.) Defendant Thomas also informed Plaintiff that "food abstinence may be requested in accordance with provisions for fasting 4.3.2 outlined in the Food Service Technical Manual, 912-T-OPS." (*Id.*)

On February 21, 2024, Plaintiff submitted an Inmate Grievance explaining his request, the reasons for his request, and the communications from staff in prior grievance responses. (*Id.* at 37–38.) Plaintiff again explained his reasons for seeking to fast and abstain from speaking for 9 days. (*Id.*) Plaintiff wrote that he offered to provide Defendant Gulley with documentation demonstrating that Allfather Odin hung on the world Tree, Yggdrasill for 9 days and 9 nights to discover the secret of the sacred runes; however, Gulley did not respond to Plaintiff's offer. (*Id.* at 38.)[4] Plaintiff reiterated his request, and he noted that he never received a response to his Informal Complaint. (*Id.*)

---

[4] In Norse mythology, Yggdrasill, the world tree, is an enormous ash tree that connects the nine worlds and from which Odin hangs himself to gain mystical knowledge. *Yggdrasill*, Encyclopaedia Britannica, britannica.com/topic/Yggdrasill (last visited Aug. 4, 2026). *See Anton Int'l v. Zhang*, No. 5:21-cv-00120-JWH-KKx, 2021 WL 3017994, at *2 (C.D. Cal. April 26, 2021) (taking judicial notice of Merriam-Webster and Encyclopaedia Britannica definitions because "[c]ourts regularly take notice of dictionary definitions") (citation omitted).

On February 23, 2024, an Inmate Grievance Response was issued by Defendant Thomas, who stated that all religious accommodations must be supported by a religious text supporting the requested accommodation, and that the request and religious text will be sent to the faith services administrator for review and decision. (*Id.* at 39.) Thomas further explained that "food abstinence may be requested in accordance with provisions for fasting 4.3.2 outlined in the Food Service Technical Manual, 912-T-OPS," and that questions regarding religious fast requests for a particular religion shall be referred to the Director of Chaplaincy Services. (*Id.*)

On February 29, 2024, Plaintiff submitted an Inmate Grievance Appeal complaining that no investigation was conducted in response to his Appeal; rather, he received a cut-and-paste response that was identical to the response he received on February 14, 2024. (*Id.* at 40.) Plaintiff repeated his explanation as to why he cannot present an authoritative text demonstrating that the requested accommodation is "mandated," and he reiterated that there is nothing in DO 904 that requires a prisoner to provide documentation or religious text to show that an accommodation is "mandated" to obtain approval. (*Id.* at 41.) Finally, Plaintiff wrote that he offered to provide religious text about Allfather Odin and the World Tree and to provide an interview to discuss his belief, but the Chaplaincy never responded to his offers. (*Id.*)

On March 26, 2024, Plaintiff received the Grievance Appeal Response from Appeals Administrator Julie Bowers, who informed Plaintiff that all religious accommodations must be supported by religious text supporting the requested accommodation, and Plaintiff failed to provide religious text to meet that standard. (*Id.* at 42.) Bowers wrote that there are no strict requirements for fasting or vowing silence for 9 days in mainstream Odinism. (*Id.*) She also wrote that fasting for 9 days carries significant health risks, especially in a correctional facility; thus, for reasons of prisoner health, facility security, and communication and dietary standard, a 9-day fast cannot be safely accommodated. (*Id.*)

That same day, Plaintiff submitted his Grievance Appeal to appeal Bowers'

decision. (*Id.* at 43–44.) On May 9, 2024, Deputy General Counsel Haley Brown upheld Bowers' decision and denied Plaintiff's Grievance Appeal. (*Id.* at 45.)

On September 18, 2024, Plaintiff filed this lawsuit. (Doc. 1 at 39.)

On December 12, 2024, Director of Chaplaincy Services Thomas Arbaugh met with Plaintiff in person to discuss Plaintiff's concerns about his religious practice. (Doc. 72 at 47.) Several issues were discussed and resolved, and Plaintiff was approved for quarterly fasting to include working with a nutritionist to implement a liquid diet to ensure safety and to communicate with staff via written or other non-verbal means during periods of silence. (*Id.* at 47–51.)

## IV. Count One—Sacred Land

### A. RLUIPA Claim

#### 1. Scope of RLUIPA Claim

RLUIPA does not authorize suits against government officials in their individual capacity. *See Wood v. Yordy*, 753 F.3d 899, 904 (9th Cir. 2014) (RLUIPA "does not authorize suits against a person in anything other than an official or governmental capacity"). Further, RLUIPA does not allow for damages against officials sued in their official capacities. *Holley v. Cal. Dep't of Corr.*, 599 F.3d 1108, 1114 (9th Cir. 2010) ("[t]he Eleventh Amendment bars [a prisoner's] suit for official-capacity damages under RLUIPA"). A RLUIPA claim may proceed only for injunctive relief against officials in their official capacity. *See Wood*, 753 F.3d at 904; *Sprouse v. Ryan*, 346 F. Supp. 3d 1347, 1363 n.9 (D. Ariz. 2017).

The only Defendant named in his official capacity is Director Thornell. Thus, Plaintiff's RLUIPA claim regarding sacred land runs only against Defendant Thornell and is only for injunctive relief.

#### 2. RLUIPA Standard

RLUIPA provides, in relevant part, that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . , even if the burden results from a rule of general applicability," unless the government

establishes that the burden furthers "a compelling governmental interest" and does so by the "least restrictive means." 42 U.S.C. § 2000cc-1(a). The burden need not concern a religious practice that is compelled by, or central to, a system of religious belief. *Id.* § 2000cc–5(7)(A).

The plaintiff bears the initial burden of demonstrating that the challenged state action constitutes a "substantial burden on the exercise of his religious beliefs." *Warsoldier*, 418 F.3d at 994. If the plaintiff establishes a substantial burden, the defendant must prove that the substantial burden both furthers a compelling governmental interest and is the least restrictive means of achieving that interest. *Id.* at 995.

Although RLUIPA is to be construed broadly in favor of protecting a prisoner's religious rights, *Warsoldier*, 418 F.3d at 999, the statute does not "elevate accommodation of religious observances over an institution's need to maintain order and safety," *Cutter*, 544 U.S. at 722. A prisoner's request for religious accommodation must not override other significant interests within a prison setting. If a prisoner's request for religious accommodations "become[s] excessive, impose[s] unjustified burdens on other institutionalized persons, or jeopardize[s] the effective functioning of an institution, the facility would be free to resist the imposition." *Id.* at 726.

**3. Discussion**

For the purposes of their Motion, Defendants do not dispute that Plaintiff has a sincerely held religious belief. (Doc. 57 at 6.) The parties dispute, however, whether Plaintiff can demonstrate a substantial burden on his religious exercise.

**a. Religious Exercise at Issue**

The Court must first identify the "religious exercise" allegedly impinged upon. *Greene v. Solano Cnty. Jail*, 513 F.3d 928, 987 (9th Cir.2008). RLUIPA broadly defines "religious exercise" as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." *Id.*, citing 42 U.S.C. § 2000cc–5(7)(A). RLUIPA further provides that "[t]he use . . . of real property for the purpose of religious exercise shall be considered to be religious exercise of the person . . . that uses or intends to use the property

for that purpose." *Id.*

Plaintiff submits that the religious exercise at issue is his "ability to access sacred land for the purpose of religious exercise." (Doc. 70 at 16–17.) Plaintiff submits an excerpt from *Ódin's Chosen, A Handbook of Asatru*, by Faolchú Ifreann and Tyrosoak Josephsson. (Doc. 72 at 76–88.)[5] In the chapter titled "Our Sacred Land," Josephsson explains the importance of the Asatru relationship to sacred land: "[w]hen standing upon our sacred land, we can feel the energy of our ancestors and land spirits." (*Id.* at 80.) According to Josephsson, it is imperative that there be a sacred outdoor site to practice Asatru because it is a nature-based practice that celebrates by closely communing with nature; "[w]hen the religious bond with nature is severed, a part of the true Folk soul will die." (*Id.* at 86.) Trees, stones, mounds, and bodies of water give refuge to the land spirits and are common components of Asatru sacred places. (*Id.* at 79.) Josephsson states that, if land is shared with practitioners of other religions, who have other gods and land spirits, it creates an environment of confusion and a loss of focus for both the spirits and Asatru adherents. (*Id.* at 80.) Thus, "[i]t is also imperative to Asatru worship that such sacred places be used only by the Asatru worshippers, so as not to confuse or do harm to the spirits of the land." (*Id.* at 79.) For Asatru practitioners, "[w]herever the site for worship is located, it is important to make contact with [the land spirits], to make your intentions known, and to honor them by protecting the site and keeping it holy." (*Id.* at 82.)

Plaintiff also submits the affidavit of Mike Murray, an active participant and leader of the Asatru Religion, former member of the Board of Directors of four Asatru/Odinist churches, and Director of World Tree Ministries. (*Id.* at 107.)[6] Murray avers that the

---

[5] Defendants do not object to the excerpt submitted by Plaintiff. (*See* Doc. 75.) In the Ninth Circuit, inadmissible evidence may be considered in motions for summary judgment. *Brice v. Ameritas Life Ins. Corp.*, No. CV 2005-0013-PHS-JAT, 2005 WL 8160761, at *2 n.2 (D. Ariz. Dec. 12, 2005) (citing *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1003 (9th Cir. 2002), and *Scharf v. U.S. Attorney Gen.*, 597 F.2d 1240, 1243 (9th Cir. 1979)). Absent any objection, the Court will consider the language from *Odin's Chosen* without ruling whether it is admissible for other purposes at a later date.

[6] Defendants do not object to Murray's affidavit. (*See* Doc. 75.) Murray's affidavit is based on personal knowledge. *See* Fed. R. Civ. P. 56(c)(4); *see also Hoover v. Switlik*

minimum items necessary to practice Asatru group worship in a prison environment include, inter alia, sacred land that is secure from trespassers and has a suitable altar. (*Id.* at 109.)

Finally, in his declaration, Plaintiff avers that he sincerely believes that sacred land is required to perform Odinist/Asatru sacred rituals in a group setting and that, without sacred land, these rituals are effectively impracticable. (Doc. 72 at 14, Pl. Decl. ¶ 41.)

Defendants argue that identifying the religious exercise at issue as outdoor worship in an area that other faith groups cannot access has been found to be too narrow of a definition of religious exercise. (Doc. 57 at 7, citing *Sessing v. Beard*, No. 1:13-CV-01684-LJO, 2015 WL 3953501, at *6–7 (E.D. Cal. June 29, 2015)). In *Sessing*, the district court stated, "[t]o the extent that Plaintiff defines his religious exercise as the practice of worshipping outdoors in an area off-limits to people of other faiths, giving credence to such a narrow definition of 'exercise' might itself generate constitutional and/or RLUIPA problems." 2015 WL 3953501, at *6.[7] But the cases cited by *Sessing* in support of this statement address polices that sought to exclude faith practitioners who did not meet certain race, ethnic, or sexual orientation requirements. *See Stover v. CCA*, No. 1:12–cv–00393 2015 WL 874288 (D. Idaho Feb. 27, 2015) (Native American belief "that allowing a two-spirited person [an individual suffering from gender dysphoria] to enter a sweat lodge utilized by single-spirited individuals would desecrate the religious sanctity of the lodge" was not a compelling interest under RLUIPA justifying exclusion of transgender prisoner from sweat lodge); *Brown ex rel. Indigenous Inmates at N.D. State Prison v. Schuetzle*,

---

*Parachute Co.*, 663 F.2d 964, 966-67 (9th Cir. 1981) (finding depositions from separate cases "were the equivalent of affidavits" and appropriate for the court to consider at summary judgment). Accordingly, the Court will consider the affidavit.

[7]Notably, *Sessing* was a screening order that determined the plaintiff failed to state a RLUIPA claim because he did not allege facts "showing how the policy establishing a single, shared outdoor worship space is 'oppressive' or places 'a significantly great onus' on his religious exercise." 2015 WL 395351, at *6. Here, the Court determined that Plaintiff's allegations regarding the denial of a separate, sacred land area on which to worship sufficiently stated a claim under RLUIPA, and Defendants did not move for reconsideration of that determination. (*See* Doc. 6.)

368 F.Supp.2d 1009, 1023–1024 (D.N.D. 2005) (finding that prison officials "would be prohibited under the First Amendment from adopting a policy that prevented non-Native Americans from attending the sweat lodge ceremony"); *Morrison v. Garraghty*, 239 F.3d 648, 657 (4th Cir. 2001) (conditioning the plaintiff's access to Native American religious items on tribal membership violated the Equal Protection clause). In the instant action, Plaintiff does not claim that the religious practice at issue is to limit Odinist practitioners to a certain race, ethnicity, or sexual orientation. Thus, although the claim in *Sessing* was similar to Plaintiff's, the Idaho District Court's conclusion—that a religious practice defined as group worship on sacred land separate from other faiths is too narrow of a definition and may raise constitutional or RLUIPA concerns—is not persuasive or supported.

More importantly, as set forth above, RLUIPA broadly defines "religious exercise" as "*any* exercise of religion." *Greene*, 513 F.3d at 987 (emphasis in original); 42 U.S.C. § 2000cc–5(7)(A). It follows that Plaintiff's ability to worship and conduct rituals outdoors on sacred land that is separate from other faith groups constitutes a religious exercise for the purpose of RLUIPA. *See Davis v. Abercrombie*, No. 11-00144 LEK-BMK, 2014 WL 2716856, at *18 (D. Hawai'i June 13, 2014) (finding that the plaintiffs' "use of a sacred outdoor space, with a stone altar, is a religious exercise for the purpose of RLUIPA").

**b. Substantial Burden**

A governmental act imposes a substantial burden on religious exercise if it "(1) requires the plaintiff to participate in an activity prohibited by a sincerely held religious belief, (2) prevents the plaintiff from participating in an activity motivated by a sincerely held religious belief, or (3) "places considerable pressure on the plaintiff to violate a sincerely held religious belief." *Apache Stronghold v. United States*, 101 F.4th 1036, 1091 (9th Cir. 2024) (en banc) (Nelson, J., concurring) (internal quotation omitted). A substantial burden on religious exercise must impose a significantly great restriction or onus upon such exercise. *Warsoldier v. Woodford*, 418 F.3d 989, 995 (9th Cir. 2005) (quoting *San Jose Christian Coll. v. City of Morgan Hill*, 360 F.3d 1024, 1034 (9th Cir.

2004)). A substantial burden must be "more than an inconvenience"; it prevents a prisoner from "engaging in [religious] conduct or having a religious experience." *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1121 (9th Cir. 2000) (citations omitted).

Defendants assert that Plaintiff cannot show that the absence of a designated sacred land imposes an oppressive burden or a significantly great onus on his religious exercise. (Doc. 57 at 7.)

In Response, Plaintiff states that he sincerely believes that sacred land is required to perform Odinist/Asatru sacred rituals in a group setting. (Doc. 70 at 26.) Plaintiff's proffered excerpt from *Odin's Chosen* explains that a place sacred to the Asatru should not be used by people of other faiths because a space filled with various spirits or the energy of other religions causes a distraction, which may cause Asatru rituals "to be disrupted, useless, and perhaps even harmful." (*Id.* at 85.) To the Odinists/Asatru, once a religious bond with a certain piece of land is forged, anyone else trying to use the land for another purpose is intruding, and as mentioned, "[w]hen the religious bond with nature is severed, a part of the true Folk soul will die." (*Id.* at 86.) Plaintiff avers to his belief in Odinist teaching that it is necessary to pursue a relationship with the unique land spirits (or land-wights) in the place where Odinists practice their religion; that trees, stones, earthen mounds, and any bodies of water give refuge to the land spirits; and that the sacred place where Odinists practice should only be used by Odinist worshippers so as not to harm the land spirits. (Doc. 72 at 12, Pl. Decl. ¶ 34.) Plaintiff describes in detail how Odinists use a circle marked with stones to commune with their Gods, Goddesses, and nature during religious rights; the significance of a fire pit within this circle; the importance of a ritual altar and symbolic bushes on either side of the altar; and how Odinists make a "Longship of Ancestral Way" with stones in the shape of a longship to represent ancestral burial mounds. (*Id.* 36–40.) Plaintiff asserts that, without sacred land, performing the Odinist/Asatru sacred rituals is impracticable, and Odinists are completely prevented from performing the sacred rituals as required by their tradition. (Doc. 72 at 15, Pl. Decl. ¶ 41;

Doc. 72 at 116, 121.) Plaintiff avers that the Odinist/Asatru faith community tried alternative ways to perform their sacred rituals in a group setting, but the alternatives were not working because they were constantly interrupted by intruders and forced to perform group ceremonies with other faith groups with opposing beliefs. (Doc. 72 at 17–18, Pl. Decl. ¶ 48; Doc. 72 at 117.) Plaintiff claims that access to sacred land is therefore essential to performance of his religious exercise, and that, because Defendants have denied him access to sacred land, his religious exercise has been substantially burdened. (Doc. 70 at 26.)

In their Reply, Defendants argue that courts "consistently hold that prisons are not required to build separate 'sacred' land' for each faith"; thus, there can be no substantial burden. (Doc. 75 at 3.) The cases on which Defendants rely are screening orders, which determined that the plaintiffs' facts were insufficient to demonstrate that the denial of a separate, outdoor worship area was a substantial burden without any reasonable justification. *Nible v. CDCR*, No. 1:13-cv-01127 DLB PC, 2014 WL 458186, at *7 (E.D. Cal. Feb. 4, 2014); *Fowler v. CDCR*, No. 1:13-cv-00957, 2014 WL 458168, at *7 (E.D. Cal. Feb 4, 2014).[8] These screening orders specifically noted that the plaintiffs did not explain why an outdoor area available to all faiths was insufficient for them to practice their faith. *Id.* Here, the Court determined at screening that Plaintiff's facts were sufficient to support a claim under RLUIPA, and Plaintiff has explained why an outdoor area available to all faiths is insufficient for Odinists/Asatru to practice their faith and conduct their rituals.

Defendants argue that, under *Birdwell v. Cates*, "[p]rison officials cannot be responsible for building a different house of worship for every faith in the facility or provide a different unique outdoor space for the groups that desired them." No. 2:10-cv-00719, 2012 WL 1641964, at *14 (E.D. Cal. May 9, 2012). In *Birdwell*, the district court found that the plaintiff "failed to articulate a sufficient argument on how sharing an outdoor

---

[8] The claims raised in *Nible* and *Fowler* are exactly the same as each other, and the Screening Orders' analyses of the plaintiff's claims are verbatim.

space burdens his ability to practice his religion," and therefore recommended granting summary judgment on the plaintiff's claim. *Id.* Again, here, Plaintiff has articulated an argument and submitted evidence to support that sharing outdoor space with practitioners of other faiths burdens his ability to practice his religion. Defendants did not respond to or rebut Plaintiff's averments that it is impracticable to conduct Odinist rituals in a shared outdoor space and that he and his fellow worshippers encountered problems when trying to conduct their rituals in a shared space. Nor did Defendants provide any potential remedy for such problems. (*See* Doc. 75.) *Cf. Sesssing*, 2015 WL 3953501, at *6 (noting that the plaintiff may schedule a time to worship with other Odinists when the pagan grounds are not being used by other prisoners).

Finally, the record shows that Defendants refused to provide a designated sacred land area for Odinist ceremonial purposes because "the designation of specific sacred sites within a correctional setting is not a fundamental requirement for practicing [Odinism]." (Doc. 72 at 110, 118.) As mentioned, preventing a plaintiff from participating in "in an activity motivated by a sincerely held religious belief qualifies as prohibiting free exercise." *Apache Stronghold*, 101 F.4th at 1052. Plaintiff's desire to practice Odinist/Astaru rituals on sacred land is motivated by a sincerely held religious belief; thus, preventing him from participating in such would amount to a substantial burden.

A factfinder could find that Defendants' refusal to provide a separate outdoor space for Plaintiff and his fellow Odinist worshippers to conduct their religious ceremonies and rituals—which Plaintiff sincerely believes is required to effectively commune with their gods, goddesses, and land spirits, and which Odinist/Astura texts inform is necessary—is more than an inconvenience and actually prevents Plaintiff from having a religious experience. *See Worldwide Church of God*, 227 F.3d at 1121. Accordingly, there exists a genuine issue of material fact whether Defendants' conduct amounts to a substantial burden on Plaintiff's religious exercise.

**c. Compelling Governmental Interest**

Because Plaintiff has met his burden to show that Defendants' denial of separate

sacred land for Odinists' religious practice substantially burdens his religious exercise, the burden shifts to Defendants to show that this denial "(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc–1(a). In this analysis, the Court must give "'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'" *Cutter v. Wilkinson*, 544 U.S. 709, 722–23 (2005).

Defendants assert that no faith-based groups have access to "sacred land" at ADCRR, and there is a compelling governmental interest in the practice of denying designated sacred outdoor space to Odinists because, if ADCRR were to allow dedicated land for every religion in every facility, it would have to purchase more land or take away land from other purposes, and there would be set up and maintenance costs. (Doc. 57 at 3, 6, 8.) This "slippery slope" argument by defense counsel, absent any supporting evidence, is unavailing. *See Nunez v. Wolf*, 117 F.4th 137, 147–48 (3d Cir. 2024) (noting that a "slippery slope" argument might be persuasive "if the government can demonstrate—with evidence, not just say-so—that an accommodation would . . . snowball in a way that would meaningfully impede prison functions"); *Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 593 n. 4 (9th Cir. 2002) (arguments and statements of counsel are not evidence"). RLUIPA requires a "focused" inquiry, and "requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *Holt v. Hobbs*, 574 U.S. 352, 363 (2015) (quotation omitted). "Because the focus is on the interest in burdening the specific prisoner, the state's interest in merely avoiding other and additional accommodations—a slippery slope—is usually insufficient." *Ackerman v. Washington*, 16 F.4th 170, 187 (6th Cir. 2021); *see Holt*, 574 U.S. at 368 (rejecting the defendants' argument that, if the plaintiff is allowed a beard for religious reasons, many other prisoners may request a beards because "this

argument is but another formulation of the classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions") (quotation omitted). Moreover, denying Plaintiff's requested accommodation simply because no religious groups at ADCRR have been designated "sacred land" is a deficient reason for denial; a "no-exception policy has no place as a stand-alone justification under RLUIPA because 'accommodations' or 'exceptions' are the entire point of the Act." *Ackerman v. Washington*, 16 F.4th 170, 188 (6th Cir. 2021) (quoting *Haight v. Thompson*, 763 F.3d 554, 562 (6th Cir. 2014).

Defendants also assert that ADCRR policy requires a sufficient number of prisoners practicing a particular faith to justify the allocation of resources for specialized religious accommodations. (Doc. 57 at 13.) According to Defendants, because there are only 77 Odinist prisoners at ADCRR (vs. 1,714 prisoners who identify as Native American practitioners), and only 10 Odinist prisoners in Plaintiff's Complex, it is logistically and administratively impractical to maintain a separate outdoor worship area for Odinist prisoners. (Doc. 57 at 13–14.) But Defendants do not submit any evidence to support this claim, nor do they identify the section within DO 904 that requires a sufficient or certain number of prisoners to practice a particular faith to justify the allocation of resources for an accommodation. (*See id.*) Defendants also fail to submit any evidence of the logistical and administrative measures that would be required to accommodate a separate outdoor worship area for Odinist prisoners. (*See id.*; *see* Doc. 58.)[9]

Meanwhile, Plaintiff avers that, based on his personal knowledge of the South Unit, where he is currently housed and where he has been housed numerous times over the last 20 years, there are at least four different locations that have been vacant for years and could be used as a sacred area for the Odinist/Asatru faith community to perform their sacred

[9] The only declaration submitted by Defendants is that of N. Wood, the ADCRR Faith Services Administrator. (Doc. 58 at 7, Wood Decl. ¶ 1.) Wood avers as to the number of registered Odinists and Native American prisoners at ADCRR, and about the procedures for requesting multi-faith and outdoor gatherings, but she does not aver that maintaining a separate outdoor worship area for Odinist prisoners would be logistically and administratively impractical. (*Id.* ¶¶ 7–25.)

rituals outdoors. (Doc. 72 at 21, Pl. Decl. ¶ 59.) Plaintiff describes where these four different locations are at South Unit. (*Id.*) Defendants do not respond to Plaintiff's suggestion or explain why these locations would not be practicable. Plaintiff also submits undisputed evidence that at least 15 Odinists/Asatru prisoners participate in weekly, indoor Odinist group services at South Unit, whereas, in November 2025, only 6 Native American prisoners participated in a sweat lodge ceremony at South Unit. (*Id.* ¶¶ 54, 57.) Defendants do not respond to this evidence or explain why the number of prisoners actually practicing a certain religion does not support allocation of resources for an accommodation, as opposed to the number of prisoners simply registered under a certain religion.

RLUIPA requires courts to undergo a fact-intensive inquiry and "scrutiniz[e] the asserted harm of granting specific exemptions to particular religious claimants." *Holt*, 574 U.S. at 362–63. Because Defendants fail to submit any facts or evidence of the asserted harm if Plaintiff's requested accommodation were granted, they cannot meet their burden to show that the denial furthers a compelling governmental interest. Summary judgment on the RLUIPA claim related to sacred land will therefore be denied.

**B. First Amendment Claim**

**1. First Amendment Standard**

"Inmates clearly retain protections afforded by the First Amendment . . . including its directive that no law shall prohibit the free exercise of religion." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (citations omitted). "[R]easonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendments." *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972). Nevertheless, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *O'Lone*, 482 U.S. at 348.

To implicate the Free Exercise Clause, a prisoner must show that the belief at issue is both "sincerely held" and "rooted in religious belief." *Malik v. Brown*, 16 F.3d 330, 333

(9th Cir. 1994); *see Shakur v. Schriro*, 514 F.3d 878, 884–85 (9th Cir. 2008) (noting that the "sincerity test," not the "centrality test," applies to a free exercise analysis).

After the prisoner makes this initial showing, he must show that prison officials substantially burden the practice of his religion by preventing him from engaging in conduct which he sincerely believes is consistent with his faith. *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989); *Shakur*, 514 F.3d at 884–85. "A substantial burden . . . place[s] more than an inconvenience on religious exercise; it must have a tendency to coerce individuals into acting contrary to their religious beliefs or exert substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Ohno v. Yasuma*, 723 F.3d 984, 1011 (9th Cir. 2013) (quoting *Guru Nanak Sikh Soc'y of Yuba City v. Cnty. of Sutter*, 456 F.3d 978, 988 (9th Cir. 2006) (internal quotation marks and alterations omitted)).

A regulation that substantially burdens a prisoner's right to freely exercise his religion will be upheld only if it is reasonably related to a legitimate penological interest. *Shakur*, 514 F.3d at 884–85. In *Turner v. Safley*, the Supreme Court identified four factors that must be balanced in determining whether a prison regulation is reasonably related to a legitimate penological interest: (1) there must be a valid, rational connection between the regulation and the legitimate governmental interest; (2) whether there are alternative means of exercising the right that remain open to prisoners; (3) the impact accommodation of the right will have on guards and other prisoners, and on the allocation of prison resources; and (4) the absence of ready alternatives. *Shakur*, 514 F.3d at 884 (citing *Turner*, 482 U.S. 482 U.S. 78, 89–90 (1987)).

**2. Analysis**

**a. Sincerely Held Religious Belief**

A religion need not be a mainstream faith. *See Thomas v. Review Bd.*, 450 U.S. 707, 714 (1981). Nor must it be based on a belief in the existence of a supreme being (or beings, for polytheistic faiths). *See Torcaso v. Watkins*, 367 U.S. 488, 495 & n.11 (1961); *Malnak v. Yogi*, 592 F.2d 197, 200–15 (3d Cir. 1979) (Adams, J., concurring); *Theriault v. Silber*, 547 F.2d 1279, 1281 (5th Cir. 1977) (per curiam). The question of sincerity "is, of course,

a question of fact"; therefore, it cannot be decided at summary judgment. *United States v. Seeger*, 380 U.S. 163, 185 (1965).

As stated above, for the purposes of this Motion, Defendants do not dispute that Plaintiff has a sincerely held religious belief. (Doc. 57 at 6.) Thus, Plaintiff makes the first showing in the free-exercise analysis.

**b. Substantial Burden**

The next step in the analysis is whether Plaintiff can demonstrate a substantial burden to his religious belief. *See Shakur*, 514 F.3d at 884. The First Amendment substantial-burden test is the same as that used under RLUIPA. *Sprouse v. Ryan*, 346 F. Supp. 3d 1347, 1357 (D. Ariz. 2017) (citing *Warsoldier*, 418 F.3d at 995–96, and *Nelson v. Miller*, 570 F.3d 868, 877 (7th Cir. 2009)). The Court has already determined that there exists a question of fact whether Defendants' refusal to provide outdoor sacred land constitutes a substantial burden on Plaintiff's religious exercise.

**c. *Turner* Analysis**

The Court must therefore examine whether Defendants' refusal to provide outdoor sacred land for Plaintiff's Odinist/Asatru rituals furthers a legitimate penological interest. *See Shakur*, 514 F.3d at 884; *Turner*, 482 U.S. at 89.

In their Motion, Defendants set out the "Legal Standard" for the First Amendment, which identifies the four *Turner* factors that must be considered in a First Amendment analysis. (Doc. 57 at 4–6.) But Defendants do not proceed to apply the *Turner* factors to Plaintiff's First Amendment claim related to sacred land. (*See id.* at 6–8.) Setting out the applicable legal standard and the *Turner* factors is not an argument. As a pro se plaintiff, Plaintiff "cannot be expected to anticipate and prospectively oppose argument that an opposing defendant does not make." *See Greene v. Solano Cnty. Jail*, 513 F.3d 982, 990 (9th Cir. 2008); *see also Nissan*, 210 F.3d at 1102 (summary judgment movant must "either produce evidence negating an essential element of" the claim at issue or show that the plaintiff does "not have enough evidence of an essential element to carry [his] ultimate burden of persuasion at trial").

Due to the deficiency of Defendants' argument and their failure to adequately address the *Turner* factors, they fail to meet their initial burden to show that denial of Plaintiff's request for outside sacred land furthers a legitimate penological interest. Summary judgment will therefore be denied on Plaintiff's First Amendment claim related to sacred land.

**V. Count Two—Fasting and Vow of Silence**

**A RLUIPA Claim Against Defendant Thornell**

Plaintiff concedes that, in December 2024, he was approved for quarterly fasting and vows of silence under conditions to ensure his health and maintain written communication with staff. (Doc. 72 at 47–51; *see* Doc. 70 at 9–12.) Accordingly, Plaintiff's RLUIPA claim is moot because "[o]nly injunctive relief, not monetary damages, is available pursuant to RLUIPA." *Al Saud v. Days*, 50 F.4th 705, 709 (9th Cir. 2022). Summary judgment will be granted as to the RLUIPA claim against Defendant Thornell related to fasting and a vow of silence.

**B. First Amendment Claim**

Damages are available for First Amendment violations; therefore, Plaintiff's First Amendment claim related to fasting and vows of silence remains. *See Tanzin v. Tanvir*, 592 U.S. 43, 50 (2020) ("damages claims have always been available under § 1983 for clearly established violations of the First Amendment").

Defendants do not dispute that Plaintiff sincerely believes that fasting and taking a vow of silence for 9 days is consistent with his faith. (*See* Doc. 57 at 9.) The next question in the analysis is whether Defendants substantially burdened Plaintiff's religious practice when they refused to allow him to fast and observe a vow of silence for 9 days. *See Hernandez*, 490 U.S. at 699.

Defendants argue that the denial did not constitute a substantial burden because ADCRR did not prohibit fasting altogether, it merely limited the duration based on health and safety concerns. (Doc. 57 at 9.) Defendants cite to portions of DO 904 that allow for religious fasting and set forth the process for requesting a fast. (Doc. 58 at 10, Wood Decl.

¶¶ 26–27, 29; Doc. 58 at 20.) Defendants further argue that denial of Plaintiff's request for a 9-day fast constituted a single, isolated denial that was later reversed, and a single denial does not constitute a substantial burden under the First Amendment. (Doc. 57 at 9.)

Plaintiff fails to respond to Defendants' argument regarding the substantial burden prong. (*See* Doc. 70.) Plaintiff does not dispute that ADCRR policy allowed for religious fasting with approval. Thus, there was not an outright ban on religious fasting. *Cf. Greene*, 513 F.3d at 988 ("an outright ban on a particular religious exercise" is considered a substantial burden). Nor does Plaintiff articulate how being denied a 9-day fast, as opposed to a shorter fast, substantially burdened his religious practice. *See Guru*, 456 F.3d at 988 (a substantial burden "must have a tendency to coerce individuals into acting contrary to their religious beliefs or exert substantial pressure on an adherent to modify his behavior and to violate his beliefs"). Consequently, Plaintiff fails to meet his burden to show a substantial burden, and the Court need not address the *Turner* factors. Summary judgment will be granted as to Plaintiff's First Amendment claim related to fasting and a vow of silence.

## VI. Count Two-Equal Protection Claim Regarding Sacred Land

### A. Legal Standard

The Equal Protection Clause requires that persons who are similarly situated be treated alike. *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985); *Shakur*, 514 F.3d at 891. "Moreover, the Equal Protection Clause entitles each prisoner to 'a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts.'" *Shakur*, 514 F.3d at 891 (quoting *Cruz v. Beto*, 405 U.S. 319, 322 (1972)). A prisoner's religious discrimination claim is governed by the four-part balancing test required by *Turner*. *Fuqua v. Raak*, 120 F.4th 1346, 1356 (9th Cir. 2024). The prisoner's claim will fail "if the difference between the defendants' treatment of [the plaintiff] and their treatment of [other] inmates [of other religions] is 'reasonably related to legitimate penological interests.'" *Id.* (quoting *Shakur*, 514 F.3d at 891). Although "[p]risons need not provide identical facilities or personnel to

different faiths," they "must make 'good faith accommodation of the [prisoners'] rights in light of practical considerations.'" *Freeman v. Arpaio*, 125 F.3d 732, 737 (9th Cir. 1997) (citation omitted), *abrogated on other grounds by Shakur*, 514 F.3d at 884–85.

**B. Discussion**

Defendants argue that the differential treatment between Native American prisoners and Odinist prisoners is supported by a rational basis grounded in legitimate penological interests. (*Id.* at 13.) Defendants assert that the rational basis is found in ADCRR's policy that requires a sufficient number of prisoners practicing a particular faith to justify the allocation of resources for specialized religious accommodations. (*Id.*) Defendants reiterate that there are approximately 1,714 prisoners who identify with Native American spiritual practices, whereas there are only approximately 77 Odinist prisoners to identify with Odinist/Asatru spiritual practices, and only 10 Odinist prisoners in Plaintiff's complex. (*Id.*) According to Defendants, "[t]he disparity in numbers makes it logistically and administratively impractical to construct and maintain a separate outdoor worship area for Odinist inmates." (*Id.*)

The Ninth Circuit has held that, with respect to religious discrimination claims in the prison context, the rational basis standard argued by Defendants is the incorrect standard of review. *Shakur*, 514 F.3d at 891 (finding that, when the district court addressed the Muslim plaintiff's Equal Protection claim, it applied the wrong standard of review by substituting mere rational basis review for the four-part balancing test required by *Turner*). A mere rational basis for disparate treatment of prisoners of different religious faiths is not sufficient; rather, the proper standard is the four-part test under *Turner*. *Id.* In failing to apply the correct standard, Defendants cannot meet their initial summary judgment burden on Plaintiff's Equal Protection claim related to sacred land.

Moreover, Defendants did not dispute Plaintiff's evidence that at least 15 Odinist practitioners participate in weekly, indoor Odinist services at his Complex while only 6 Native American practitioners were observed in the recent Sweat Lodge ceremony at his Complex, which undercuts the claim that there are too few Odinists to justify the allocation

of resources for Plaintiff's requested accommodation.

Finally, Defendants' purported penological interest is the impractical logistical and administrative costs of providing a separate outside worship area for Odinist prisoners. As discussed above, Defendants fail to submit any evidence of the logistical and administrative measures that would be required to accommodate a separate outdoor worship area for Odinist prisoners and what the costs of those measures would be. *See id.* at 891–92 (finding that summary judgment on Equal Protection claim was inappropriate because the record was not sufficiently developed to ascertain the precise cost of providing kosher meat to Muslims and it was "not at all clear that the prison's purported cost justification is even valid given the large expense it already undertakes to provide its Jewish inmates with costly kosher meals").

In light of the above, Defendants' request for summary judgment on Plaintiff's Equal Protection claim related to sacred land in Count Two will be denied.

## VII. Successive Motion for Summary Judgment

A district court has discretion to permit successive motions for summary judgment. *Hoffman v. Tonnemacher*, 593 F.3d 908, 911–12 (9th Cir. 2010).

The required analyses under RLUIPA, the First Amendment, and the Equal Protection Clause are fact intensive inquires, and in their summary judgment briefing, Defendants fail to present relevant evidence or sufficiently develop the record with respect to Plaintiff's claims related to sacred land. To be sure, allowing Defendants to file a second summary judgment motion when they failed to meet their evidentiary burden on the first summary judgment motion would prejudice Plaintiff, a pro se prisoner litigant. *See Nguyen v. United States*, 792 F.2d 1500, 1503 (9th Cir. 1986) (noting that the value of summary judgment would be diminished if a party could amend the issues to be decided in the same case after that party lost on summary judgment); *Doherty v. Portland Cmty. College*, No. CV-99-1375-ST, 2000 WL 33200560, at *3 (D. Or. Nov. 15, 2000) (denying the plaintiff's motion for leave to file second summary judgment motion because it "would unduly prejudice [the defendant] and unfairly give [the plaintiff] the proverbial second bite at the

apple”). The Court is loath to set a new summary judgment deadline in these circumstances.

Nonetheless, the record in this matter is incomplete. Summary judgment briefing with a more developed record will serve to flesh out the relevant facts and either be dispositive of Plaintiff’s claims or narrow the issues prior to trial. The Court will therefore set a second dispositive motion deadline.

But, with respect to the remaining RLUIPA claim and First Amendment claim related to sacred land, the Court will not entertain further arguments regarding the substantial burden prong of either claim; the findings made herein will stand. **Any further summary judgment motions must be limited to, on the RLUIPA claim, whether the burden on Plaintiff furthers a compelling governmental interest and does so by the least restrictive means, and, on the First Amendment claim, whether the regulation denying Plaintiff sacred land for religious practice is reasonably related to a legitimate penological interest under the *Turner* test.**

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Defendants’ Motion for Summary Judgment (Doc. 57).

(2) Defendants’ Motion for Summary Judgment (Doc. 57) is **granted in part** and **denied in part** as follows:

(a) the Motion is **granted** as to the RLUIPA claim related to fasting and vows of silence within Count Two, and this claim is dismissed without prejudice as moot;

(b the Motion is **granted** as to the First Amendment claim related to fasting and vows of silence within Count Two, and this claim is dismissed with prejudice.

(c) the Motion is otherwise **denied**.

(3) The remaining claims are Count One—the RLUIPA and First Amendment claims against Thornell in his official capacity and against Thomas, O’Brien, and McKone

in their individual capacities with respect to Plaintiff's request for sacred land for group ceremonies; and Count Two—the Equal Protection claim with respect to Plaintiff's request for sacred land against Thornell in his official capacity and against Gulley, Thoams, O'Brien, and McKone in their individual capacities.

(4) Within **30 days** of the date of this Order, the parties may file summary judgment motions as provided for in this Order.

Dated this 8th day of September, 2026.

James A. Teilborg
Senior United States District Judge